UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

CASE NO.  8:14-Cr-107 | 35 AEP

LAURA LEYVA



18 U.S.C. § 1349
18 U.S.C. § 1956(h)
18 U.S.C. § 982 (forfeiture)

## INDICTMENT

The Grand Jury charges:

## Introduction

At all times relevant to this Indictment:

## A.   The Medicare Program

1.     The Medicare Program ("Medicare") was a federal "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that provided medical benefits, items and services (collectively "services") to persons age 65 and older or with certain disabilities (hereinafter "beneficiaries").

2.     Medicare included coverage under two primary components, hospital insurance (Part A) and medical insurance (Part B).  Part A of Medicare ("Medicare Part A") was a hospital insurance program that covered beneficiaries for, among other things, inpatient care in hospitals and rehabilitation services that

would be covered by Medicare if furnished in an inpatient hospital setting.  Part B of Medicare ("Medicare Part B") provided supplemental medical insurance to beneficiaries for, among other things, medically-necessary outpatient care and physical/occupational therapy services.

3.     The Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services, oversaw and administered Medicare throughout the United States. CMS divided the United States into geographic regions and contracted with various companies in those regions to assist in the administration of Medicare.  First Coast Service Options, Inc. ("First Coast") was responsible for administering Medicare in Florida, by virtue of its contract with CMS.   In particular, First Coast was responsible for receiving, processing, and paying Medicare Part A and Medicare Part B claims that were submitted by Florida-based Medicare providers.

4.     A Comprehensive Outpatient Rehabilitation Facility ("CORF") was a non-residential facility primarily engaged in providing diagnostic, therapeutic, and restorative services to outpatients for the rehabilitation of the injured and disabled or to patients recovering from illness.   CORFs were required to provide a comprehensive, coordinated, skilled rehabilitation program for its patients, that included, at a minimum, CORF physicians' services, physical therapy services, and social or psychological services.   In addition to this basic package of medically necessary skilled rehabilitation services, CORFs could also furnish to its patients, among other things, occupational therapy and respiratory therapy

2

services (collectively referred to as "CORF services"). Although CORF services were billed under Medicare Part A, such services were reimbursed with Medicare Part B funds. Ultimately, CORF services were reimbursable by Medicare, if those services would be covered by Medicare in an inpatient hospital setting.

5.     To become a patient of a CORF, the Medicare beneficiary had to be under the care of a physician (the "referring physician") who certified that the beneficiary required CORF services. The referring physician had to advise the CORF of the beneficiary's medical history, current diagnosis and medical findings, and desired rehabilitation goals. In addition, CORF services could only be furnished under a written plan of treatment established and signed by a physician who had recently evaluated the patient. To be reimbursable under Medicare, CORF services had to be reasonable and medically necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member.

6.     An Outpatient Physical Therapy provider ("OPT") was a freestanding facility that provided outpatient physical therapy, occupational therapy, and speech-language pathology services ("OPT services") to Medicare beneficiaries under a written plan of treatment. This written plan of treatment had to be established and signed by a physician or non-physician practitioner who recently evaluated the patient. Furthermore, OPT patients were required to be under the care of a physician or non-physician practitioner who ordered or certified the need for OPT services. OPTs had to maintain clinical records for all

patients. OPT services provided to Medicare beneficiaries were covered by Medicare Part B. Although OPT services were subject to an annual payment cap, Medicare Part B could still reimburse for OPT services exceeding the cap as long as they were medically necessary.

7.    To become a qualified Medicare provider, a CORF or OPT first had to apply for and obtain a "Medicare Identification Number" (commonly referred to as a "provider number"), which was used for identification and billing purposes.

8.    If a Florida-based CORF or OPT with a Medicare provider number changed ownership, the new owner, in order to continue participating in Medicare, was required to submit a Form CMS 855A, Medicare Enrollment Application, to First Coast. Pursuant to the Medicare enrollment application, the new CORF or OPT owner was required to certify that he or she would not knowingly present or cause to be presented a false or fraudulent claim for reimbursement under Medicare.

9.    Medicare assigned a unique health insurance claim number ("HICN") to each beneficiary for billing and identification purposes. The HICN consisted of the Social Security Number of the beneficiary. For a claim to be processed by Medicare, the HICN had to be valid and belong to an actual person.

10.    Physicians or non-physician practitioners who certified the beneficiary's need for CORF or OPT services and the therapists who provided such services, were also assigned unique identification numbers, which

consisted of a National Provider Identifier ("NPI") and/or a Unique Physician Identification Number ("UPIN"). These identification numbers were also used for billing and identification purposes.

11.    Payments for CORF or OPT services rendered under Medicare were often made directly to the CORF or OPT rather than to the beneficiary. For this to occur, the Medicare beneficiary would assign the right of payment to the CORF or OPT. Once such an assignment was made, the CORF or OPT would submit the Medicare claims for reimbursement and would receive Medicare payments directly from First Coast. In some cases, Florida-based CORFs and OPTs used third-party billing companies to submit their Medicare claims to First Coast.

12.    To seek reimbursement under Medicare, a CORF or OPT, or its third-party billing company, would submit to First Coast, a health insurance claim form (the "Medicare claim form"), either electronically or in paper format. A Medicare claim form submitted by a CORF or OPT was required to include certain information, including, but not limited to:

> (a)    the Medicare beneficiary's name and HICN;
>
> (b)    the CORF's or OPT's name, address, and provider number;
>
> (c)    the name and NPI or UPIN of the physician who certified the need for the CORF or OPT services and, in some cases, the name and NPI of the therapist who personally provided those services to the Medicare beneficiary;

(d)     the date upon which the CORF or OPT services were provided to the Medicare beneficiary; and

(e)     the specific type of CORF or OPT services that were provided to the Medicare beneficiary, as reflected by the Current Procedural Terminology ("CPT") code corresponding to such service. The CPT was a systematic listing and coding of medical procedures and services performed by Medicare providers, including CORFs and OPTs. Each procedure or service was identified by a five-digit code. CORFs and OPTs used CPT codes to certify the type of services that had been provided to the beneficiary and for which reimbursement was being sought under Medicare; First Coast, as the administrator of Medicare in Florida, used the CPT codes to determine the appropriate amount to be paid under Medicare for those services.

13.     If the CORF's or OPT's Medicare claim was approved, a substantial portion of the total amount of the claim was paid either by check (made payable to the CORF or OPT) or by wire transfer to an account designated by the CORF or OPT.

B.     **Entities and Individuals**

14.     Renew Therapy Center of Port St. Lucie, LLC ("Renew Therapy") was a Florida company with a principal place business at 1850 S.E. Port St. Lucie Boulevard, Fort Pierce, St. Lucie County, Florida. Renew Therapy was a CORF.

15.    From in or around November 2007 and continuing through in or around August 2009, approximately $10,549,361 in claims for reimbursement were submitted in the name of Renew Therapy to Medicare.  As a result of those claims, Medicare made payments to Renew Therapy in the approximate amount of $6,248,056.

16.    Luis Alberto Garcia Perojo and Rafael Roche worked at Renew Therapy.

17.    Luis Alberto Garcia Perojo and Rafael Roche also were officers of Ariguanabo Investment Group, Inc., a Florida corporation with a principal place of business at 175 Fountainbleau Boulevard, Suite 2-G2, Miami-Dade County, Florida.

18.    Luis Alberto Garcia Perojo and Rafael Roche had signature authority on a business bank account for Ariguanabo Investment Group at Bank of America, Bank of America account number ending 2636.

19.    From in or around February 2009 and continuing through in or around September 2009, approximately $1,234,873 from Renew Therapy was deposited into Ariguanabo Investment Group's Bank of America account ending 2636.

20.    Luis Alberto Garcia Perojo and Rafael Roche also were officers of IRE Diagnostic Center, Inc., ("IRE Diagnostic Center"), a Florida corporation with a principal place of business at 1455 N. Treasure Drive, Apt. 4N, North Miami Village, Miami-Dade County, Florida.

21.     Luis Alberto Garcia Perojo and Rafael Roche had signature authority on a business bank account for IRE Diagnostic Center at Bank of America, Bank of America account number ending 9655.

22.     From in or around August 2008 and continuing through in or around January 2009, approximately $612,348 from Renew Therapy was deposited into IRE Diagnostic Center's Bank of America account ending 9655.

23.     American Rehab of Kissimmee, Inc., a/k/a American Rehab of South Florida, Inc., ("American Rehab") was a Florida corporation with a principal place of business at 211 West Cypress Street, Kissimmee, Osceola County, Florida, and 2800 W. 84th Street, Suite 11, Hialeah, Miami-Dade County, Florida. American Rehab was a CORF.

24.     Physician Consultants, Inc. was a Florida corporation with a principal place of business at 3782 W. 12th Avenue, Hialeah, Miami-Dade County, Florida.

C.     **The Defendant**

25.     Defendant LAURA LEYVA was President, Secretary, Director, Registered Agent, and Administrator of American Rehab, and President and Director of Physician Consultants.

26.     LAURA LEYVA had signature authority on a business bank account for American Rehab at Bank of America, account number ending 7390.

27.     LAURA LEYVA had signature authority on a business bank account for Physician Consultants at Space Coast Credit Union, account number ending 5140.

28.     From in or around October 17, 2007, and continuing through in or around March 23, 2009, approximately $2,543,368 in claims for reimbursement were submitted in the name of American Rehab to Medicare. As a result of those claims, Medicare made payments to American Rehab in the approximate amount of $1,074,278, approximately $1,060,080 of which was deposited into American Rehab's business bank account, Bank of America account number ending 7390.

29.     From in or around February 2009 and continuing through in or around March 2009, approximately $146,007 from American Rehab was deposited into Ariguanabo Investment Group's Bank of America account ending 2636.

30.     From in or around December 2008 and continuing through in or around January 2009, approximately $51,449 from American Rehab was deposited into IRE Diagnostic Center's Bank of America account ending 9655.

**COUNT ONE**
**(Conspiracy To Commit Health Care Fraud)**
**(18 U.S.C. § 1349)**

1.     Paragraphs 1 through 30 of the Introduction section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

9

2.      Beginning in or around June 2007 and continuing through in or around November 2009, in the Middle District of Florida, and elsewhere, the defendant,

### LAURA LEYVA

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown, to violate Title 18, United States Code, Section 1347, that is, to execute and attempt to execute a scheme and artifice to defraud Medicare, a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare.

### **Purpose of the Conspiracy**

3.      It was a purpose and object of the conspiracy for LAURA LEYVA and her co-conspirators to unlawfully enrich themselves by, among other things, (a) submitting false and fraudulent claims to Medicare; (b) concealing the submission of false and fraudulent claims to Medicare, and the receipt and transfer of the proceeds from the fraud; (c) offering and paying kickbacks and bribes to use identifying information belonging Medicare beneficiaries, and (d) diverting proceeds of the fraud for their personal use and benefit.

10

## **Manner and Means**

The manner and means by which the Defendant and her co-conspirators sought to accomplish the purpose and object of the conspiracy included, among others, the following:

4.      LAURA LEYVA would obtain and maintain control of American Rehab for purposes of submitting false and fraudulent Medicare reimbursement claims;

5.      LAURA LEYVA and co-conspirators would pay patient recruiters and others to obtain personal identifying information of Medicare beneficiaries for purposes of falsely billing Medicare;

6.      LAURA LEYVA would pay co-conspirators in exchange for falsified medical records for purposes of falsely billing Medicare;

7.      LAURA LEYVA and co-conspirators would submit and cause the submission of fraudulent Medicare reimbursement claims for services not legitimately prescribed and not rendered by CORFs, including American Rehab and Renew Therapy;

8.      LAURA LEYVA and co-conspirators would pay other co-conspirators a percentage of fraud proceeds received from Medicare as a kickback for access to identifying information of Medicare beneficiaries;

9.      LAURA LEYVA and co-conspirators would share Medicare beneficiary identifying information between American Rehab and Renew Therapy

for the purpose of submitting and causing the submission of fraudulent reimbursement claims;

10.    LAURA LEYVA and co-conspirators would control business bank accounts which they used to receive and disburse fraud proceeds; and

11.    LAURA LEYVA and co-conspirators would perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purposes of, and the acts done in furtherance of, said conspiracy.

All in violation of Title 18, United States Code, Section 1349.

### COUNT TWO
### (Conspiracy To Commit Money Laundering)
### (18 U.S.C. § 1956(h))

1.    Paragraphs 1 through 30 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    Beginning in or around June 2007 and continuing through in or around November 2009 in the Middle District of Florida, and elsewhere, the defendant,

### LAURA LEYVA

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, and agree with persons, known and unknown to the Grand Jury, to commit offenses against the United States, that is,

a.    to knowingly conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property

involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.    to knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE

1.    The allegations contained above are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(1), (a)(2), and (a)(7).

2.    The defendant, LAURA LEYVA, upon conviction of the violations alleged in Count One of this Indictment, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any

property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3.    The defendant, LAURA LEYVA, upon conviction of the violations alleged in Count Two of this Indictment, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the offense, or any property traceable to such property.

4.    The property to be forfeited includes, but is not limited to, a forfeiture money judgment of at least $1,074,278.

5.    If any of the property described above, as a result of any act or omission of the defendant:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third
              party;

        c.    has been placed beyond the jurisdiction of the court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be
              divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL,

FOREPERSON

A. LEE BENTLEY, III
United States Attorney

By:

CHRISTOPHER J. HUNTER
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

By:

ROBERT A. MOSAKOWSKI
Assistant United States Attorney
Chief, Economic Crimes Section

FORM OBD-34
APR 1991

No.

## UNITED STATES DISTRICT COURT
Middle District of Florida
Tampa Division

THE UNITED STATES OF AMERICA

vs.

LAURA LEYVA

## INDICTMENT

Violations:    18 U.S.C. § 1349
18 U.S.C. § 1956(h)

A true bill,

_____
Foreperson

Filed in open court this 20th day

of March 2014.

_____
Clerk

Bail    $_____

FILED

GPO 863 525